United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MICHAEL CYRUS,

    Petitioner,

vs.

B. CURRY, Warden,

    Respondent.

No. C 07-1220 PJH (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

Petitioner, a California prisoner currently incarcerated at the Correctional Training Facility, has filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging the February 2006 decision by the Board of Parole Hearings ("Board") finding petitioner unsuitable for parole. For the reasons set forth below, the petition will be denied.

## BACKGROUND

The Board relied on the summary of facts of the commitment offense set forth by the Court of Appeal:

> In June of 1988, Michael Dean Cyrus had been living with his girlfriend, the victim, Melanie Ann M., in an apartment building in Costa Mesa. On the date of these events, June 21st, arrangements were made for them to meet another couple at the Goat Hill Tavern after work. Cyrus and the other couple arrived first at about 5:30 p.m., and began drinking; Melanie arrived about an hour later. The two couples continued drinking beer for sometime thereafter.
>
> Cyrus argued with other bar patrons. He first took offense at some remark by an unidentified customer which he (Cyrus) interpreted as relevant to his American Indian heritage. Cyrus became enraged and it appeared to witnesses that a fight would result until the other person withdrew and left the bar. Later, observing from a distance that another man said something to Melanie, Cyrus approached and angrily demanded to know what was said. Not receiving what he considered to be a satisfactory response, Cyrus then turned on Melanie, grabbing her about the neck and choking her, and demanding to know the nature of the conversation. After Cyrus released her, she began to cry, appeared embarrassed and angry, took her purse and ran from the bar. According to witnesses, she

arrived back at the apartment she shared with Cyrus between 10:00 and 10:30 p.m. that night.

When Cyrus attempted to leave the parking lot of the tavern sometime later, his friends tried to talk him out of driving because he was too drunk. He angrily punched his car and insisted on driving home. He also told his friends that his relationship with Melanie was "over." Eventually he did drive out of the parking lot, consciously avoiding a police car nearby because he had been drinking, and was observed to arrive at the apartment complex a few minutes after Melanie.

Shortly after Cyrus' arrival, neighbors heard a loud argument in the apartment. One neighbor, who lived directly below, heard an angry male voice say "you are cheating on me, you fucking bitch," and heard a female voice shriek "help, he's trying to kill me." This loud argument was followed by a single gunshot.

One neighbor had called the police before the gunshot. Another man, Ron Smith, the maintenance man for the apartment complex, went to the apartment after hearing the shot in an attempt to quell the disturbance. Cyrus opened the door with observable blood on him and, in response to Smith's inquiry, said "I think I just killed my wife" and invited Smith into the bedroom to assist. Smith observed Melanie lying on the bed in a pool of blood and a handgun on the bed nearby. [Footnote 1: The bullet which killed the victim was fired from this weapon into her head from a distance of about two feet.] Observing the victim, who appeared dead, Smith said "there ain't nothing I can do for her" and departed. Cyrus appeared during this encounter to be "as calm as can be," but as Smith left he heard Cyrus begin screaming and yelling that he had shot his girlfriend.

Cyrus was yelling hysterically when police arrived. An officer told him to come down the outside stairs to the apartment. Cyrus "dove" down the stairs, sliding on his stomach to the bottom. He was handcuffed and continued screaming and crying hysterically and making a series of mostly incoherent statements which the police tape recorded. Subsequent testing indicated his blood alcohol level about one and a half hours after the shooting was .17 percent.

The autopsy on the victim's body, in addition to establishing the cause of death as a single gunshot wound to the head, revealed numerous bruises and abrasions about her neck, arms, and shoulders. [Footnote 2: At trial, one witness who had been a friend and former co-worker of the victim, testified that about a week before her death, Melanie had displayed several bruises about her head and shoulders which she said had been inflicted by Cyrus.]

At trial, Cyrus did not dispute the evidence that the fatal shot was fired from his loaded gun which he kept in the apartment. However, he testified that he did not recall whether he or the victim obtained the handgun from the shelf near the bed where it was kept, but did recall struggling with her over it. The struggle followed, according to Cyrus, a heated argument during which he punched and kicked

2

> the walls because "she wouldn't let me leave, you know." Cyrus said he remembered seeing "both of our hands on the gun" and "hearing the sound of the gun going off" but said he had no recollection of "how the gun got into my hand" or of it even being in his hand when it was fired. He testified that when the gun went off he looked down and "saw the gun in my hand." He also testified that he loved Melanie, that they planned to get married, and that he never intended to harm her.
>
> A rebuttal witness for the People who had lunch with Melanie on the day she was killed, testified that Melanie was afraid of Cyrus and wanted out of the relationship because of his drinking and jealousy, but was afraid to leave him because of his violent nature. Another rebuttal witness, a police officer from Inyo County, who had known Cyrus for many years when Cyrus resided there, testified that Cyrus' personality changed when drinking. He became very aggressive, and his reputation among police officers and others in Bishop, California was of a "person to be cautious of" when he had been drinking. The officer also testified to a recent incident in a bar in Bishop where Cyrus challenged uniformed officers to fight when he was arrested for being drunk in public.

Answer Ex. B (*People v. Cyrus*, No. G008574 (Cal. Ct. App. Oct. 19, 1990)).

In July 1989, a jury found petitioner guilty of second degree murder with use of a firearm. He was sentenced to seventeen years to life in prison. Answer Ex. A (Judgment of Commitment). On February 7, 2006, petitioner, represented by counsel, appeared for his fourth parole consideration hearing before the Board, which denied parole for three years.

Petitioner sought habeas relief from state superior court, which denied his habeas petition on July 6, 2006. Answer Ex. G. Petitioner sought relief from the court of appeal, which summarily denied his habeas petition, and the state supreme court, which summarily denied his petition for review. Answer Exs. I, K.

Petitioner filed a federal petition for writ of habeas corpus in the District Court for the Central District of California, which transferred the petition to this court. On April 30, 2007, the court ordered respondent to show cause why a petition should not be issued. Respondent has filed an answer, and petitioner has filed a traverse. Respondent does not dispute that the petition is timely and presents claims that were exhausted in state court. The petition is submitted for a decision on the merits.

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).  The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13.  A state court decision is an "unreasonable application of Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.  The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.  Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under Section 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*,  537 U.S. at 340.

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion of a state court. *See Ylst v.*

4

*Nunnemaker*, 501 U.S. 797, 801-806 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n. 2 (9th Cir. 2000), *cert. denied*, 534 U.S. 944 (2001). Where the state court gives no reasoned explanation of its decision on a petitioner's federal claim and there is no reasoned lower court decision on the claim, a federal court conducts "an independent review of the record" to determine whether the state court's decision was an unreasonable application of clearly established federal law. *See Plascencia v. Alameida*, 467 F.3d 1190, 1198 (9th Cir. 2006); *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).

## DISCUSSION

As grounds for federal habeas relief, petitioner asserts his due process rights were denied when on February 7, 2006, the Board denied him parole based on the circumstances of his crime. Petitioner also contends that the parole denial increases his term of imprisonment in violation of his right to a jury trial, and that he is entitled to a release date. None of these claims merits habeas relief.

**I.     Due Process in Parole Suitability Determinations**

**A.     Some Evidence Standard of Judicial Review**

The Ninth Circuit has determined that a California prisoner with a sentence of a term of years to life with the possibility of parole has a protected liberty interest in release on parole and therefore a right to due process in the parole suitability proceedings. *See McQuillion v. Duncan*, 306 F.3d 895, 902 (9th Cir. 2002) (citing *Board of Pardons v. Allen*, 482 U.S. 369 (1987); *Greenholtz v. Inmates of Nebraska Penal & Corr. Complex*, 442 U.S. 1 (1979)). *See also Irons v. Carey*, 505 F.3d 846, 851 (9th Cir.), *reh'g and reh'g en banc denied*, 506 F.3d 951 (9th Cir. 2007); *Sass v. California Board of Prison Terms*, 461 F.3d 1123, 1127-28 (9th Cir. 2006), *reh'g and reh'g en banc denied*, No. 05-16455 (9th Cir. Feb. 13, 2007); *Biggs v. Terhune*, 334 F.3d 910, 915-16 (9th Cir. 2003).

A parole board's decision satisfies the requirements of due process if "some evidence" supports the decision. *Sass*, 461 F.3d at 1128-29 (adopting some evidence standard for disciplinary hearings outlined in *Superintendent v. Hill*, 472 U.S. 445, 454-55 (1985)). *See also Irons*, 505 F.3d at 851. "To determine whether the some evidence

5

standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached'" by the parole board. *Sass*, 461 F.3d at 1128 (quoting *Hill*, 472 U.S. at 455-56). The "some evidence standard is minimal, and assures that 'the record is not so devoid of evidence that the findings of the . . . board were without support or otherwise arbitrary.'" *Id.* at 1129 (quoting *Hill*, 472 U.S. at 457).

Respondent contends that an inmate is entitled to only minimal protections to satisfy due process in a parole proceeding. Citing *Greenholtz*, respondent contends that due process in state parole procedures is satisfied merely if they afford the inmate an opportunity to be heard and a decision informing him why he did not qualify for parole release. The Ninth Circuit, however, has held that requiring less than the some evidence standard "would violate clearly established federal law because it would mean that a state could interfere with a liberty interest - that in parole - without support or in an otherwise arbitrary manner." *Sass*, 461 F.3d at 1129. Thus, the some evidence standard of *Superintendent v. Hill* is clearly established law in the context of parole denial for purposes of federal habeas review. *Ibid.*

In order to determine whether the state court decisions were contrary to, or an unreasonable application of, clearly established federal law, the court looks to the last reasoned state court opinion, which is that of the superior court denying the state habeas petition. Answer Ex. G (*In re Cyrus*, No. M-10924, slip op. (Super. Ct. Orange Co. July 6, 2006)). *See Shackleford*, 234 F.3d at 1079 n.2.

**B.    Board's Unsuitability Determination**

In his first claim for relief, petitioner contends that his due process rights were violated because the Board's decision was not supported by some evidence. The superior court denied this claim on the following grounds:

> The petition for writ of habeas corpus does not set forth a prima facie case for relief. Contrary to petitioner's claim, the determination made by the Board of Parole Hearings does not lack

6

>evidentiary support.  The Board reasonably relied upon the violent circumstances of the commitment offense, as reflected in the record, to conclude that petitioner is currently unsuitable for release on parole.  (See, Pen. Code, § 3041(b); Cal. Code of Regs., tit. 15, § 2402(b) and (c)(1)(B)(D).)
>
>On the evening of the offense, the agitated and intoxicated petitioner physically confronted the victim at a local establishment about a conversation she had with a male patron.  During the altercation, petitioner grabbed the victim by the neck and feigned choking her.  The fearful victim fled from the bar in tears.  Petitioner proceeded to drive and follow the victim back to her home and threatened her with a weapon.  Petitioner ultimately fatally shot the unarmed victim in the head while she lay in bed.  In view of the violent and unprovoked circumstances surrounding the victim's murder, no abuse of discretion is perceived in the finding made by the Board on this issue.
>
>The Board further relied on petitioner's history of drug and alcohol abuse as well as his two prior convictions for driving under the influence to find him unsuitable for parole.  The evidence in the record supports this finding.  Petitioner admitted using alcohol since the age of 15 as well as using marijuana and methamphetamine.  He did not dispute the fact that he had sustained two prior convictions for driving under the influence.  Given that the instant offense and petitioner's prior convictions stem directly from his abuse of alcohol, such factors are relevant to petitioner's parole suitability and were reasonably relied upon by the Board in its evaluation of petitioner's case.  (Cal. Code of Regs., tit. 15, § 2402(b).)
>
>The Board also found that petitioner had been recently disciplined for misconduct.  This finding is supported by evidence in the record which reflects the issuance of a December 26, 2004 institutional citation for engaging in mutual combat with another inmate in an open yard.  The Board expressed concern that petitioner may not have elected to pursue alternatives to fighting.  Though the record does suggest that petitioner may have been defending himself from an attack, the manner in which specified factors are considered and balanced lies within the broad discretion of the Board.  In this instance, the Board's concern over petitioner's exercise in judgment in a volatile situation is warranted in view of the violent and unprovoked nature of the commitment offense.  No abuse of discretion is evident in this finding.
>
>Finally, the Board relied on opposition to parole expressed by the Orange County District Attorney's Office.  No abuse of discretion is established as the Board is required to consider the views of the People's representative when considering the parole suitability of a particular inmate.  (Pen. Code, § 3046(c).)

*In re Cyrus*, slip op. at 2-3.

7

### 1.     State Regulations Governing Parole Suitability

In assessing whether the Board's denial of parole was supported by some evidence, the court's "analysis is framed by the statutes and regulations governing parole suitability determinations in the relevant state." *Irons*, 505 F.3d at 851 (citing *Biggs*, 334 F.3d at 915). "Accordingly, here we must look to California law to determine the findings that are necessary to deem a prisoner unsuitable for parole, and then must review the record in order to determine whether the state court decision holding that these findings were supported by 'some evidence' in [petitioner's] case constituted an unreasonable application of the 'some evidence' principle articulated in *Hill*, 472 U.S. at 454." *Ibid.* Under California law, "[t]he Board must determine whether a prisoner is presently too dangerous to be deemed suitable for parole based on the 'circumstances tending to show unsuitability' and the 'circumstances tending to show suitability' set forth in Cal. Code. Regs., tit.15 § 2402(c)-(d)." *Ibid.*

Title fifteen, section 2402, of the California Code of Regulations sets forth the criteria for determining whether an inmate is suitable for release on parole.  The circumstances tending to show that a prisoner is unsuitable include the following: (1) the commitment offense, where the offense was committed in "an especially heinous, atrocious or cruel manner;" (2) the prisoner's previous record of violence; (3) "a history of unstable or tumultuous relationships with others;" (4) commission of "sadistic sexual offenses;" (5) "a lengthy history of severe mental problems related to the offense;" and (6) "serious misconduct in prison or jail."  Cal. Code. Regs., tit. 15 § 2402(c).  The circumstances tending to show that a prisoner is suitable for parole include the following: (1) the prisoner has no juvenile record; (2) the prisoner has experienced reasonably stable relationships with others; (3) the prisoner has shown remorse; (4) the prisoner committed his crime as the result of significant stress in his life; (5) the prisoner suffered from Battered Woman Syndrome at the time of committing the crime; (6) the prisoner lacks any significant history of violent crime; (7) the prisoner's present age reduces the risk of recidivism; (8) the prisoner "has made realistic plans for release or has developed marketable skills that can

8

be put to use upon release;" and (9) institutional activities "indicate an enhanced ability to function within the law upon release." Cal. Code. Regs., tit. 15 § 2402(d).

### 2. *Biggs* Challenge

In support of his claim that the Board's decision was not supported by some evidence, petitioner argues that the Board improperly relied on the unchanging circumstances of the commitment offense and his prior history to find him unsuitable for parole. The Ninth Circuit has suggested in dicta that sole reliance on the commitment offense could raise "serious questions" about a state prisoner's liberty interest in parole. *See Biggs*, 334 F.3d at 916-17. *Biggs* upheld the initial denial of a parole release date based solely on the nature of the crime and the prisoner's conduct before incarceration, but cautioned that the value of the criminal offense fades over time as a predictor of parole suitability: "The Parole Board's decision is one of 'equity' and requires a careful balancing and assessment of the factors considered. . . . A continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." *Biggs*, 334 F.3d at 916-17.

As the Ninth Circuit noted in *Sass*, "*Biggs* affirmed a denial of parole after holding that the circumstances of the offense and conduct prior to imprisonment constituted some evidence to support the Parole Board's decision." *Sass*, 461 F.3d at 1126 (citing *Biggs*, 334 F.3d at 917). *See Biggs*, 334 F.3d at 916 ("As in the present instance, the parole board's sole supportable reliance on the gravity of the offense and conduct prior to imprisonment to justify denial of parole can be initially justified as fulfilling the requirements set forth by state law.").

The Ninth Circuit has expressed competing views on *Biggs* in subsequent panel decisions. In *Sass*, the Ninth Circuit held that evidence of Sass's prior offenses and the gravity of his commitment offenses constituted some evidence to support the Board's decision. 461 F.3d at 1129. Acknowledging the cautionary statements in *Biggs* concerning the potential for a due process violation by continued reliance in the future on immutable

9

factors, *Sass* criticized that part of the opinion as improper speculation about how future parole hearings could proceed. *Ibid.*

In *Irons*, however, the Ninth Circuit echoed the concern raised in *Biggs* and expressed its "hope that the Board will come to recognize that in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes." *Irons*, 505 F.3d at 854 (citing *Biggs*, 334 F.3d at 917). Although the court determined that the Board's unsuitability finding was supported by "some evidence" that Irons's crime was especially cruel and callous, the *Irons* panel pointed out that in the cases holding that sole reliance on the commitment offense did not violate due process, namely, *Irons*, *Sass* and *Biggs*, "the decision was made before the inmate had served the minimum number of years required by his sentence." *Irons*, 505 F.3d at 852-54. *Irons* reasoned that due process was not violated when these prisoners were deemed unsuitable for parole "prior to the expiration of their minimum terms," even if they had demonstrated substantial evidence of rehabilitation. *Id.* at 854.

Recently, the Ninth Circuit held rehearing en banc in *Hayward v. Marshall*, 512 F.3d 536 (9th Cir.), *reh'g en banc granted*, 527 F.3d 797 (9th Cir. 2008), which presented a state prisoner's due process habeas challenge to the denial of parole. The three-judge *Hayward* panel had concluded that the gravity of the commitment offense had no predictive value regarding the petitioner's suitability for parole, and held that the governor's reversal of parole was not supported by some evidence and resulted in a due process violation. 512 F.3d at 546-47. The Ninth Circuit has not yet issued an en banc decision in *Hayward*; since holding rehearing en banc on June 24, 2008, the Ninth Circuit has ordered briefing on the question, *inter alia*, whether to defer submission of the matter pending the California Supreme Court's decisions in *In re Lawrence*, No. S154018 and *In re Shaputis*, No. S155872, both of which cases were argued on June 4, 2008. *Hayward v. Marshall*, No. 06-55392, slip op. at 2 (9th Cir. July 10, 2008).

Unless or until the en banc court overrules the holdings of the earlier Ninth Circuit panel decisions in *Biggs*, *Sass* and *Irons*, these cases hold that California's parole scheme creates a federally protected liberty interest in parole and therefore a right to due process which is satisfied if some evidence supports the Board's parole suitability decision. *Sass*, 461 F.3d at 1128-29. These cases also hold that the Board may rely on immutable events, such as the nature of the conviction offense and pre-conviction criminality, to find that the prisoner is not currently suitable for parole, *Sass*, 461 F.3d at 1129. *Biggs* and *Irons* further suggest, however, that over time, the commitment offense and pre-conviction behavior become less reliable predictors of danger to society such that repeated denial of parole based solely on immutable events, regardless of the extent of rehabilitation during incarceration, could violate due process at some point after the prisoner serves the minimum term on his sentence. *See Irons*, 505 F.3d at 853-54.

Relying on *Biggs* and *Irons*, petitioner contends that the commitment offense is no longer a reliable predictor of his present and future dangerousness and does not satisfy the "some evidence" standard. Respondent counters that the court may not grant relief on the purported *Biggs* claim because *Biggs* is not clearly established federal law as determined by the Supreme Court. Assuming, without deciding, that under some circumstances, habeas relief may be granted under *Biggs* on a claim that parole denial based on the Board's sole reliance on the commitment offense and other unchanging factors does not satisfy the some evidence standard, the court finds that petitioner fails to establish the predicate for a *Biggs* claim because the Board did not rely solely on the unchanging factors of his commitment offense and prior history, but also his recent disciplinary citation, as discussed further below.

### 3.  **Parole Unsuitability**

At the February 2006 hearing, the Board considered several factors favoring petitioner's suitability for parole, including his educational and vocational programming, job skills, willingness to help other inmates, and participation in a Native American spiritual program, sports, and Alcoholics Anonymous. Answer Ex. D at 17-20. Petitioner offered

11

letters of support from his cousin, uncle and parents offering residence and financial support. *Id.* at 21-24. Petitioner also received a favorable psychological evaluation. *See* Answer Ex. E (Psychological Evaluation, Jan. 20, 2006).

The Board found that petitioner had realistic parole plans for his residence, but lacked firm employment possibilities. Answer Ex. D at 48. The Board also concluded that petitioner had limited success in programming, finding that petitioner did not advance his education since 1994, and did not have certification in any trade. *Id.* at 17, 46, 50.

Having considered factors of suitability, the Board nonetheless concluded that petitioner posed an unreasonable risk of danger to society and a threat to public safety if released from prison based on the following factors of unsuitability: (1) the commitment offense was carried out in an especially cruel, dispassionate and calculated manner demonstrating an exceptionally callous disregard for human suffering; (2) prior history of drug and alcohol abuse and prior criminal convictions; and (3) disciplinary record.

### a. Commitment Offense

The regulations provide that the Board may consider the following factors in determining whether the commitment offense was "especially heinous, atrocious or cruel:" (A) multiple victims were attacked, injured or killed in the same or separate incidents; (B) the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder; (C) the victim was abused, defiled or mutilated during or after the offense; (D) the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering; (E) the motive for the crime is inexplicable or very trivial in relation to the offense. Cal. Code Regs., tit. 15 § 2402(c)(1).

Petitioner did not discuss the commitment offense at the 2006 parole hearing. The deputy district attorney for Orange County appeared at the hearing to oppose parole, and argued that the record indicated that the commitment offense was not merely an accidental, drunken shooting, but the victim was petitioner's live-in girlfriend and involved in an abusive relationship with him, as reported by the victim's friends. Answer Ex. D at 30. The deputy district attorney noted that the victim once had petitioner's bite marks on her cheek, and

12

that on the night she was killed, the victim had bruises on her body and strangulation marks on her throat. *Ibid.* Earlier that night, petitioner confronted the victim at a bar when he saw her talking to another man, and grabbed her by the neck. *Id.* at 30-31. The victim left the bar crying, and petitioner drove himself home after drinking. *Id.* at 31. The deputy district attorney stated that when petitioner arrived at their home, he yelled at the victim and hit and kicked the walls, as evidenced by seven to nine holes in the wall.[1] *Ibid.* The victim yelled, "He's going to kill me," at which point one of the neighbors called the police. *Ibid.* Then, petitioner shot and killed the victim, although he maintained that he did not know how the gun was obtained.[2] *Ibid.*

    The record contains some evidence to support the Board's determination that the offense was carried out "in an especially cruel and callous manner in that you shot the victim in her own home, on her bed, in the head," noting that "[n]umerous bruises and abrasions were found on her neck, arms and shoulders." *Id.* at 45. The Board also found that the commitment offense was carried in a dispassionate and calculated manner as evidenced by petitioner grabbing the victim's neck earlier that night at the bar, terrorizing and instilling such fear that she ran out of the bar crying. *Ibid.* The Board further found that petitioner was very angry as demonstrated by punching his car and stating that their relationship was over, then proceeding to drive under the influence and threatening the victim with a weapon. *Id.* at 45-46. There was also some evidence to support the Board's

---

[1] The evidence in the record indicates that there were nine holes in the wall of the bedroom and several near the headboard where the victim was lying. Answer Ex. C at 2a (Pre-Sentence Report).

[2] When asked at the hearing about the gun, petitioner could not remember how he got hold of the gun:

> I remember it going off and that was - I kind of snapped out of it a little bit. But I could see, but I couldn't see. I mean I could - knew she was hurt, but I couldn't tell how bad. It was like my vision was blurred a little bit. But that's how the gun - I don't know how the gun came into play, actually. But I remember kind of snapping out of it after the gun went off.

Answer Ex. D at 27.

13

finding that the offense was carried out in a manner demonstrating exceptionally callous disregard for human suffering in that she cried out, "Help, he's trying to kill me," before petitioner shot and killed her. *Ibid.* The record also contains some evidence to support the Board's finding that petitioner had a clear opportunity to cease at many instances, but continued to threaten and ultimately kill the victim. *Ibid.*

The Board also found that petitioner had a callous disregard for public safety in carrying and firing a weapon, but the record does not contain evidence that anyone else, other than the victim, was inside the apartment within petitioner's firing range or otherwise endangered. *Id.* at 46. Nonetheless, the other factors upon which the Board relied do amount to some evidence in support of the Board's finding that the crime was committed in a cruel, dispassionate and calculated manner.

### b.    Prior History

The Board reviewed petitioner's criminal history, consisting of two convictions for drunken driving in 1981 and 1983. Answer Ex. D at 5-6. Petitioner was also arrested for being drunk in public in 1982, 1983 and 1987, and for resisting arrest. *Id.* at 6; Answer Ex. C at 17-18 (Pre-Sentence Report). At the hearing, petitioner discussed his history of alcohol and drug abuse which started at age fifteen with drinking, and in his early twenties with marijuana and methamphetamine. Answer Ex. D at 25-26. He admitted that he drank heavily in college and was not able to complete his degree. *Id.* at 9. He also admitted that when he worked in the construction field, he drank even more heavily, going to the bar with coworkers. *Id.* at 25. The evaluating psychiatrist noted that alcohol was directly related to the commitment offense and that use of alcohol was a significant risk factor. *Id.* at 17; Answer Ex. E at 3. An hour and a half after he was taken into custody on the night of the murder, petitioner, who was then age twenty-five, had a blood alcohol level of 0.17. Answer Ex. D at 34.

Petitioner attended Alcoholics Anonymous ("AA") groups in prison since 1999, and planned to maintain his sobriety by continuing to attend AA meetings and help others, but

he had not contacted AA groups in the areas where he would be paroled.  Answer Ex. D at 16, 29-30, 40-41.

The record demonstrates that the Board took petitioner's history of substance abuse into account when making an individualized assessment of his future dangerousness.  *See Thompson v. Davis*, 295 F.3d 890, 898 n.4 (9th Cir. 2002) ("The parole board claims to have and undeniably does have legitimate penological interests in considering the plaintiffs' substance abuse backgrounds during the individualized inquiry for parole suitability.").  The Board recognized that petitioner had job capabilities in operating heavy equipment, but expressed concern that he developed more trouble with alcohol when working in the construction industry.  *Id.* at 47-48.  The Board then recommended that petitioner upgrade vocationally, finding that he had not been certified in any trade.  *Id.* at 50.

The record contains some evidence to support the Board's finding that petitioner was unsuitable for parole based on his history of drug and alcohol abuse and his prior criminal history.

### c. Disciplinary Misconduct

The Board reviewed petitioner's disciplinary record, which was "almost discipline-free," but found that besides two minor disciplinary violations for failing to stand for count and for not complying with grooming standards, he received a "115" serious rules violation report and was placed in administrative segregation in December 2004 for mutual combat.  Answer Ex. D at 15-16, 47.  In that situation, petitioner and another inmate were fighting on the yard, although a staff person submitted a chrono suggesting that petitioner was protecting himself and indicating that the other inmate had received three previous "115" reports for instigating similar infractions.  *Id.* at 16.  The Board determined that although petitioner's involvement was self-protective, "the incident did occur on the open yard where there were likely other alternatives other than combat."  *Id.* at 47.  There is therefore some evidence to support the Board's finding that petitioner's disciplinary citation made him unsuitable for parole.

Contrary to petitioner's claim that the Board's decision violated his right to due process, the record contains some evidence to support the Board's parole unsuitability determination. The state courts' denial of habeas relief on this claim was neither contrary to, nor an unreasonable application of, clearly established federal law.

**II.     Length of Sentence**

    **A.     *Apprendi/Blakely* Claim**

Petitioner contends that by considering factors that were not submitted to a jury to deny parole and extend his sentence, the Board violated his right to have a jury determine beyond a reasonable doubt all facts legally essential to his sentence. Petitioner relies on the line of cases following *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), where the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." The relevant statutory maximum "is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings." *Blakely v. Washington*, 542 U.S. 296, 303-04 (2004) (applying *Apprendi* to hold that a state trial judge violated the defendant's Sixth Amendment right to a trial by jury by extending his sentence beyond the statutory maximum based on factual determinations that were not submitted to a jury).

The statutory maximum for petitioner's crime, murder in the second degree, is life imprisonment. Cal. Penal Code § 190(a). No additional facts must be found beyond those which were found by the jury at petitioner's trial in order for him to be imprisoned for life. Petitioner has no right to a jury trial in connection with parole determinations before the expiration of his life sentence. *See Blakely*, 542 U.S. at 308-09 ("indeterminate schemes involve judicial factfinding, in that a judge (like a parole board) may implicitly rule on those facts he deems important to the exercise of his sentencing discretion"). The state courts' denial of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law.

16

**B.     Release Date**

Petitioner also contends that the Board denied him due process by failing to set a term of years and set his release date, citing section 3041 of the California Penal Code which compels the Board to "normally set a parole release date" one year prior to an inmate's minimum release date. Petitioner further argues that state law establishes uniform terms for specific offenses, referring to title fifteen, section 2403, of the California Code of Regulations, which sets forth a matrix of base terms for second degree murder. Those regulations provide in part: "The panel shall set a base term for each life prisoner who is found suitable for parole. The base term shall be established solely on the gravity of the base crime, taking into account all of the circumstances of that crime." Cal. Code Regs. tit.15, § 2403.

Petitioner was sentenced to an indeterminate term of seventeen years to life. It has long been established under state law that the suitability determination precedes any effort to calculate a parole release date. *See In re Dannenberg*, 34 Cal. 4th 1061, 1080, *cert. denied*, 546 U.S. 844 (2005). In *Dannenberg*, the California Supreme Court held that Section 3041 does not require the Board to set a term of years for prisoners sentenced to indeterminate terms. *Id.* at 1082-84. That is not required until the Board finds the prisoner suitable for parole. *Id.* Because the Board determined that petitioner was not suitable for parole, the Board was not required to set a parole release date or apply the matrix of base terms. *See Irons*, 505 F.3d at 851 n.3.

Finally, petitioner contends that the Board routinely denies parole, demonstrating a systematic bias against granting parole in violation of due process. The Board conducted an individualized assessment of petitioner's suitability, reviewing and discussing the evidence with petitioner and his attorney before announcing its decision. The Board explained the facts it relied upon in finding him unsuitable for parole. These factors negate the allegation that the Board's decision was based on a policy against granting parole, rather than an individualized consideration of petitioner's suitability. This claim is therefore denied.

17

**CONCLUSION**

Based on the foregoing, the petition for a writ of habeas corpus is DENIED. The clerk of the court shall terminate all pending motions, enter judgment for respondent, and close the file.

**IT IS SO ORDERED.**

Dated: August 8, 2008.

PHYLLIS J. HAMILTON
United States District Judge

G:\PRO-SE\PJH\HC.07\Cyrus1220.deny.wpd